UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
AZARIAH RICHARDSON,                :
                                   :
                 Plaintiff,        :
                                   :    04 Civ. 05314 (THK)
        -against-                  :
                                   :    **MEMORANDUM OPINION**
                                   :    **AND ORDER**
CITY OF NEW YORK and NICOLE        :
WAITE,                             :
                                   :
                 Defendants.       :
----------------------------------X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff Azariah Richardson claims that while he was seventeen years old and under the supervision of the New York City Department of Probation ("DOP"), his probation officer coerced him into engaging in several sexual acts. Plaintiff asserts claims against the City of New York ("the City") under 42 U.S.C. § 1983, for failing to properly train and supervise former New York City Probation Officer Nicole Waite ("Waite"), and for common law negligence. Plaintiff further seeks to hold the City vicariously liable for the alleged assault and battery by Waite. As to Defendant Waite, Plaintiff asserts a claim against her, under 42 U.S.C. § 1983, for violating his substantive due process rights, and also asserts state common law claims for assault, battery and infliction of emotional distress.[1]

_____

[1] Plaintiff's Complaint also asserts claims against both Defendants under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d(c). (See First Amended Verified Complaint, dated Mar. 16, 2006 ("Compl."), ¶ 31.) Since Plaintiff has made no reference to these claims anywhere in the record, the

The parties consented to trial before this Court pursuant to 28 U.S.C. § 636(c).  Presently before the Court are Defendants' Motions for Summary Judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court grants Defendant New York City's motion for summary judgment, and denies Defendant Waite's motion for summary judgment.

## BACKGROUND

I.   <u>The Allegations</u>

On April 29, 2003, Plaintiff pled guilty to Criminal Possession of Marijuana in the Fifth Degree, in violation of New York Penal Law § 221.10.  (<u>See</u> New York City Department of Probation Court Order for Investigation and Report, dated Apr. 29, 2003, attached as Exhibit ("Ex.") A to Declaration of Hillary A. Frommer, dated June 2, 2006 ("Frommer Decl.").)  The Criminal Court set a sentencing date of June 10, 2003 and, pending the results of a pre-sentence investigation, promised Plaintiff a sentence of three days of community service and, if found eligible, Youthful Offender status.[2] (<u>See</u> <u>id.</u>)  The court ordered Plaintiff to report

Court will infer that they have been abandoned.  <u>See, e.g.</u>, <u>Singleton v. City of Newburgh</u>, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (where claim was alleged in the complaint but "not raised elsewhere in the record," court deems claim "abandoned").

[2] Under New York law, "Youthful Offender" status allows a sentence with a maximum indeterminate term of four years incarceration, and requires that all official records and papers be sealed. <u>See</u> New York Criminal Procedure Law §§ 720.10, 720.20 (McKinney 2005); <u>U.S. v. Driskell</u>, 277 F.3d 150, 152 (2d Cir. 2002) (citing <u>Capital Newspapers Div. of the Hearst Corp. v.</u>

to the DOP for a pre-sentence investigation to determine, <u>inter alia</u>, whether he was entitled to Youthful Offender status.[3]  (<u>See</u> Deposition of Azariah Richardson, dated Dec. 7, 2005, Dec. 15, 2005 and March 23, 2006 ("Richardson Dep."), at 27.)[4]  Plaintiff went directly from court to the DOP, where Waite was assigned to Plaintiff's case. (<u>See</u> <u>id.</u> at 27-28.)[5]

Plaintiff claims that over the course of the following month,

_____

<u>Moynihan</u>, 71 N.Y.2d 263, 268 (1988).

[3] The DOP deals with criminal defendants and probationers. "Probationer" refers to an individual who has been sentenced by a Criminal Court judge to a term of probation with the DOP. (<u>See</u> Deposition of Christopher Costello, dated Jan. 30, 2006 ("Costello Dep."), attached as Ex. D to Frommer Decl., at 8.) A "defendant" is an individual who is under the supervision of the DOP for the purpose of completing a pre-sentence report ("PSR"). (<u>See</u> <u>id.</u> at 9-10.)  A PSR is used to aid the court or the presiding judge in sentencing a defendant and to help the DOP supervise the defendant if he is later sentenced to a term of probation.  (<u>See</u> <u>id.</u> at 55-56.) A PSR includes information about a defendant's legal, medical, family and education history, and where applicable, a recommendation as to whether the defendant should receive Youthful Offender status. (<u>See</u> <u>id.</u> at 56-57; New York City Department of Probation Pre-Sentence Investigation of Azariah Misheal Miller Richardson, dated June 6, 2003 ("Richardson PSR"), attached as Ex. 1 to Plaintiff's Local Rule 56.1 Statement of Material Facts in Response to the City of New York's Statement of Material Facts, dated July 19, 2006 ("Pl.'s 56.1 Stmt.").)

[4] Plaintiff's full deposition was not provided to the Court. Various excerpts are attached as exhibits to the parties' Rule 56.1 Statements.

[5] Assignments to probation officers are made by supervising probation officers in consultation with DOP branch chiefs.  The primary consideration in making assignments is to maintain an equitable caseload among the probation officers. (<u>See</u> Costello Dep. at 43-45.)

3

he engaged in sexual activity with Waite on three occasions.  (See Compl. ¶ 16.)   At the time, Waite was thirty-six-years-old (see Deposition of Nicole Waite, dated Feb. 8, 2006 ("Waite Dep."), attached as Exhibit C to Frommer Decl., at 42), and Plaintiff was seventeen (see Richardson PSR).

Plaintiff claims that on one occasion, Waite made sexual advances towards him in a movie theater, and then engaged in sexual activity with him in a restaurant bathroom.  (See Compl. ¶ 16; Richardson Dep. at 60-68, 79-80, 88-95.) On another occasion, Plaintiff claims Waite instructed him to come to her office and to bring documents needed for completion of his PSR, as well as a condom.  (See Compl. ¶ 16; Richardson Dep. at 104-05.)  Plaintiff claims that after he entered Waite's office, she closed the door and subsequently performed oral sex upon him.  (See Compl. ¶ 16; Richardson Dep. at 113, 117-18.)   Plaintiff claims that on the third occasion, he and Waite had sexual intercourse at a hotel. (See Compl. ¶ 16; Richardson Dep. at 104-41.)   Waite admits to having sexual intercourse with Plaintiff one time, at a hotel, in late May 2003. (See Waite Decl. at 247-52.)

Between May and July, Plaintiff and Waite spoke on the telephone dozens of times.  (See Cellular Phone Records of Nicole Waite, attached as Ex. D to Declaration of Michael G. O'Neill, dated June 19, 2006.)  Waite also sent two letters to Plaintiff. (See Letter of Nicole Waite to Azariah Richardson, dated June 7,

2003, attached as Ex. 7 to Pl.'s 56.1 Stmt.; Letter of Nicole Waite to Azariah Richardson, dated June 23, 2003, attached as Ex. 8 to Pl.'s 56.1 Stmt.).  In both letters, Waite referenced prior sexual activity with Plaintiff.

On June 10, 2003, Plaintiff was sentenced as a Youthful Offender. (See Richardson Dep. at 333.)  Plaintiff admits calling Waite after his sentencing, but said he did so only to return her calls, or one occasion, to get information about Planned Parenthood for a relative who had impregnated his girlfriend. (See id. at 337-47.)  Plaintiff claims he complained to his family about Waite's calls to Plaintiff's home (see id. at 137-40), but did not tell them of his sexual activity with Waite, or that she was his probation officer, until his mother found and read Waite's letters (see id. 174-76, 201).[6]

Plaintiff claims that he felt threatened by Waite's position as a probation officer and that her repeated statements that he had to be "good" led him to believe that he had to submit to her sexual demands.  (See Richardson Dep. at 28-29, 376-85.)[7]  He claims he did not want to have sex with Waite, but was worried about what Waite would do to him because of his subordinate position. (See id.

_____

[6] The record does not indicate exactly when Plaintiff's mother found the letters.

[7] The parties dispute what Waite meant by being "good." Waite contends she was advising Plaintiff to stay out of trouble. Plaintiff claims that he understood being "good" to include submitting to Waite's sexual advances.

at 60-61.)  Plaintiff never explicitly told Waite he did not want to have sex with her, but attempted to thwart her advances by, among other things, mentioning that he had a girlfriend. (See id. at 386-90.) Plaintiff claims that after engaging in sexual activity with Waite, he became depressed and sought psychological treatment. (See id. at 236-41.)

II.  Nicole Waite's Tenure at the New York City Department of Probation

Waite began her employment as a probation officer with the New York City Department of Probation in 1991.  (See Waite Dep. at 9.) In order to become a probation officer, Waite was required to take an examination, pass a physical examination, and complete an interview.  (See id. at 18.)  Waite testified that she received initial training at the commencement of her employment, and continuing training on a "random" basis thereafter.  (See id. at 20-22, 57-58.)  Waite's training included instruction on how to write a PSR, the duties and responsibilities of a peace officer, and physical defense.  (See id. at 20-28, 57-65.)  Waite did not recall any training regarding the DOP Code of Conduct, social interactions with defendants, dealing with the exertion of influence in the performance of her official duties, or on the supervision of youthful offenders.[8]  (See id. at 62-64.)  Waite

_____

[8] Costello testified that when probation officers are first hired, they are required to take a two-to-four week "fundamental" training course that "primarily deals with the duties, responsibilities, tasks and standards of being a probation

received and read the DOP Code of Conduct (see Waite Dep. at 285),
and received and kept a number of Executive Acts and Policy
statements known as "EPAPs" (see id. at 28-29, 34-36).  Prior to
her supervision of Plaintiff, Waite had never been disciplined by
the DOP.  (See Waite Dep. at 65; Costello Dep. at 88-90.)  Waite's
supervisor, Christopher Costello, testified that he never received
a complaint from any defendant regarding Waite, and that no
employees at the DOP had complained to him about Waite's conduct as
a probation officer.  (See Costello Dep. at 155, 161.)  Waite
admits that no one at the DOP ever told her that she was permitted
to have a social or sexual relationship with a defendant.  (See
Waite Dep. at 286.)  Waite also admits that she never received any
EPAP that stated she was permitted to have a social or sexual
relationship with a defendant.  (See id.)

        According to Waite, at some point prior to her supervision of
Plaintiff, a letter addressed to her, from an inmate she had
supervised prior to his incarceration, was intercepted by a
supervisor.  (See Waite Dep. at 131-34.)  Waite testified that she
was questioned by her supervisor about the letter.[9]  (See id.)

---

officer and a peace officer."  (See Costello Dep. at 30-32.)
Probation officers also are required to attend training on an
ongoing basis. (See id. at 41-42.)

    [9] Waite testified that her supervisor "asked me if I knew
anything about [the letter].  I said no and he asked me if I had
had a personal relationship with him and I said no.  My
supervisor indicated that he would not have sent a letter to the
Department of Probation if it was, you know, personal and that's

III. <u>DOP Investigation and Waite's Termination</u>

Although defendants and probationers can file complaints with the DOP (<u>see</u> Costello Dep. at 155), Plaintiff never complained to the DOP about Waite (<u>see</u> Richardson Dep. at 64, 77-78).  Plaintiff claims that he did not know he could report Waite to the DOP. (<u>See</u> <u>id.</u>)

Prior to learning of the instant allegations, Costello had no knowledge of any social interaction between Waite and a defendant or probationer.  (<u>See</u> Costello Dep. at 89-90, 156.)  Waite did not tell Costello about her relationship with Plaintiff (<u>see</u> Waite Dep. at 285), or that Plaintiff had called her outside of the office (<u>see</u> <u>id.</u> at 287).  Costello saw nothing in the PSR that suggested to him that there had been any improper contact between Waite and Plaintiff.  (<u>See</u> <u>id.</u> at 156.)

At some point, Plaintiff filed a complaint against Waite with the New York City Police Department.  Waite was questioned by Costello and DOP Branch Chief Ralph Abreu about her relationship with Plaintiff.[10]  (<u>See</u> Waite Dep. at 266; Costello Dep. at 99-101.)

---

basically it."

[10] There is some confusion in the record as to when Waite's supervisors were alerted to her sexual involvement with Plaintiff.  Costello testified that Abreu was called by a New York City police officer in May 2003 and told of "some contact between a probationer and Ms. Waite." (<u>See</u> Costello Dep. at 89-90, 93.)  However, Plaintiff testified that he did not report Waite to the police until after his mother found Waite's letters, which are dated June 7, 2003 and June 25, 2003. (<u>See</u> Richardson Dep. at 174.)

She denied having a social relationship with Plaintiff.  (See id. at 101.) In October 2003, Waite was suspended without pay from the DOP for engaging in conduct in violation of the Code of Conduct. (See Letter from the City of New York Department of Probation to Nicole Waite, dated Oct. 1, 2003, attached as Ex. I to Frommer Decl.; Notice and Statement of Charges from the City of New York Department of Probation to Nicole Waite, dated Oct. 2, 2003, attached as Ex. J to Frommer Decl.) After an investigation, the City terminated Waite's employment. (See Waite Dep. at 278.)

IV.   DOP Policies

The conduct of employees of the New York City Department of Probation is governed by EPAP statements and the New York City Department of Probation Code of Conduct. (See Costello Decl. at 38-80; Code of Conduct of the City of New York Department of Probation, attached as Ex. E to Frommer Decl.)

Under the Code, it is an act of general misconduct for a DOP employee to "threaten[], intimidat[e], or harass[] a fellow employee or private citizen," to "engage[] in sexual harassment," or to engage in "conduct that is prejudicial to good order and discipline" or "that tends to bring the Department or City into disrepute." (See Code of Conduct, at 4-5.)  The Code of Conduct also states that it is a conflict of interest and conduct unbecoming a City employee to engage "in any social relationship with a probationer that would give or tend to give the impression

that a conflict of interest exists.  It is mandatory that an employee disclose to his/her superior the existence of a present or prior relationship with a probationer." (<u>See</u> Code of Conduct, at 8.)  The Code defines myriad acts which constitute "conduct unbecoming a City employee," including conflicts of interest, which includes <u>inter</u> <u>alia</u> "[m]isuing his/her official capacity for personal benefit . . . ." (<u>See</u> Code of Conduct, at 7.) An EPAP issued in August 2001 reiterates that each DOP employee must conform his or her behavior to the standards set forth in the Code. (<u>See</u> The City of New York Department of Probation Procedure No. 10-02-01, dated Aug. 16, 2001, attached as Ex. G to Frommer Decl.)

EPAPs issued in 1992 and 2001, which were provided to DOP staff, expressly state that "it is prohibited for staff to engage in any social relationship with a probationer that would give or tend to give the impression that a conflict of interest exists." (<u>See</u> The City of New York Department of Probation Procedure #EXEC-02-01, dated Feb. 7, 2001 ("Social Contact EPAP"), attached as Ex. F to Frommer Decl.;  New York City Department of Probation Executive Offices, Executive Policy and Procedure No. 10-1-92, attached as Ex. H to Frommer Decl.)  The parties dispute whether the Code and EPAPs prohibit probation officers from engaging in social relationships with "defendants."  Plaintiff contends that DOP policies do not expressly prohibit social relationships with defendants.  (<u>See</u> Plaintiff's Memorandum of Law in Opposition to

10

Defendant the City of New York's Motion for Summary Judgment, dated July 28, 2006 ("Pl.'s City Mem."), at 9.) Waite testified that she understood the prohibition on social relationships to apply only to probationers because probationers "were under the jurisdiction of the department." (See Waite Dep. at 161-64.) Costello testified that the Code clearly prohibits probation officers from taking defendants to movies or dinner or having sexual relationships with defendants.  (See Costello Dep. at 153-54.)  He also testified that probation officers are permitted to meet with defendants outside of the DOP offices only upon receiving departmental approval. (See id. at 76.)

Costello testified that, as part of his ongoing training, he had participated in a sexual pressure role-playing scenario.  (See Costello Dep. at 120.)

## DISCUSSION

I.  Standards for Summary Judgment

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the burden of showing an absence of evidence to support to non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2548 (1986).  In deciding a motion for summary judgment, a court must "must resolve all ambiguities and

draw all factual inferences in favor of the nonmoving party." McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986)).

Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to put forth "specific facts showing there is a genuine issue for trial," Fed. R. Civ. P. 56(e), or the essential elements of that party's case on which it bears the burden of proof at trial. Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2552). A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). The evidence must be sufficient for a jury to reasonably find in favor of the summary judgment opponent. Anderson, 477 U.S. at 252, 106 S. Ct. at 5212.

II.   Plaintiff's Claims Against the City

    A.   42 U.S.C. § 1983

    1.   Legal Standards

Section 1983 provides that "[e]very person who, under color [of law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable

to the party injured . . . ." 42 U.S.C. § 1983.

There is no respondeat superior liability under Section 1983. See Coon v. Town of Springfield, 404 F.3d 683, 686-87 (2d Cir. 2005) (citing Monell v. New York City Dep't of Social Services, 436 U.S. 658, 693-94, 98 S. Ct. 2018, 2037 (1978)). A municipality can be held liable under Section 1983 when the municipality itself causes a constitutional violation through a policy or custom. Monell, 436 U.S. at 694-95, 98 S. Ct. at 2037-38. Municipal liability may also be found where a government's failure to adequately train and supervise employees results in a constitutional violation and reflects a "deliberate indifference" to constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206 (1989); accord Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) ("[A] municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training."). In limited situations, such as the use of deadly force by the police, the risk is "so obvious" that failing to adequately train officers on applicable constitutional limitations can be considered deliberate indifference as a matter of law. See City of Canton, 489 at 390 n.10, 109 S.Ct. at 1205 n.10. Deliberate indifference also may be demonstrated where municipal employees are entitled to exercise their discretion, yet "so often

violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers." Id.

The Second Circuit has articulated four requirements that must be met to demonstrate "deliberate indifference" in the context of a failure to train claim.  See Green v. City of New York, 465 F.3d 65, 80-81 (2d Cir. 2006) (quoting Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992)); see also Phillips v. City of New York, 03 Civ. 4887 (VM), 2006 WL 2739321, at *27-28 (S.D.N.Y. Sept. 25, 2006).  First, the plaintiff must demonstrate that policy makers know to "a moral certainty" that municipal employees will face a given situation.  Walker, 974 F.2d at 297.  Failing to train for rare or unforseen events does not show deliberate indifference. See id.  Second, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of mishandling the situation."  Id.  Third, there must be a showing that the "wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."  Id.  Lastly, "at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'"  Green 465 F.3d at 80-81 (quoting Amnesty Am., 361 F.3d at 129); see also Amnesty Am., 361 F.3d at 128 (plaintiffs

14

"must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction") (internal citation omitted).

    2.   <u>Application</u>

Plaintiff does not contend that the City has a policy or custom of permitting probation officers to engage in sexual activity with probationers or defendants under their supervision. Instead, Plaintiff claims that the City has failed to train probation officers to refrain from engaging in social, sexual, or other coercive activity with defendants, particularly youthful offenders. (<u>See</u> Pl.'s City Mem., at 2, 8-9.)  The City responds that Plaintiff has failed to demonstrate an actionable shortcoming in the DOP's training of probation officers and, in any event, maintains that the agency has specific policies prohibiting improper contact between probation officers and persons under their supervision.  (<u>See</u> Defendant City's Reply Memorandum of Law in Support of Its Motion for Summary Judgment, dated Aug. 4, 2006, at 3.)

Plaintiff's Section 1983 claim against the City essentially focuses on the first and third prongs of the <u>Walker</u>-<u>Green</u> framework.  Plaintiff asserts that the DOP "is aware of the

inherent presence and danger of social relationships between
probation officers and those persons under supervision, and the
harm that these relationships may cause in intruding upon the
duties of the DOP, or the coercive effect that it may have on the
person under supervision." (Pl.'s City Mem., at 7.)   Plaintiff
cites as support for this contention: (1) an agency policy
directive prohibiting social relationships between probation
officers and probationers; (2) a policy that probation officers'
office doors remain open to prevent against "sexual harassment" by
probation officers, "as well as preventing other possible harms;"
and (3) that the DOP has used a sexual pressure scenario in at
least one training session with probation officers.   Id.

　　　Plaintiff appears to be attempting to establish that the DOP
is aware of a risk of sexual coercion or harassment by probation
officers.   However, as a preliminary matter, the Court notes that
Plaintiff's argument relies on a selective presentation of the
evidence on DOP policies and training.

　　　DOP Policy Against Social Relationships Between Probation
　　　Officers and Probationers

　　　The DOP EPAP, entitled "Social Contact Between Department
Staff and Probationers" is as follows:

> It is the policy of the New York City Department of
> Probation to fulfill its mandated responsibilities in a
> professional manner and to avoid conflicts of interest
> and/or the appearance of such conflicts or other
> improprieties. Accordingly, it is prohibited for staff
> to engage in any social relationship with a probationer
> that may give or tend to give the impression that a

16

conflict of interest exists.
(Social Contact EPAP.)

While the directive presumes the potential for social interaction between DOP employees and individuals under DOP supervision, the policy is directed at preventing employees from engaging in behavior that creates a conflict of interest, or the appearance of a conflict of interest.  This suggests that the policy's purpose is to ensure that agency employees, who exercise substantial authority over the liberty of defendants and probationers, discharge their duties in an impartial manner.  There is no language suggesting that the purpose of the policy is to protect probationers from coercion by DOP employees, and Plaintiff points to no evidence in the record to support such a conclusion.

The "Open Door Policy"

Plaintiff asserts the existence of a "policy" requiring that probation officers' office doors remain open "to prevent against 'sexual harassment' by probation officers, as well as other possible harms."  (See Pl.'s City Mem., at 7.) Plaintiff does not cite to any evidence in the record to support this statement, but the Court presumes he is referring to Costello's deposition testimony describing an "office policy"[11] that probation officers keep their office doors open while interviewing defendants and

---

[11] There is no evidence explaining whether the "open door policy" is a formal, codified policy or an informal office practice.

probationers. (See Costello Dep. at 121-22, 156-59.)  Costello does not identify preventing sexual harassment by probation officers as a reason behind the policy; rather, the open door policy is designed to allow probation officers to exit their offices if a probationer or defendant becomes violent.[12]

        "Sexual Pressure" Training

        Lastly, Plaintiff contends that the DOP has given "sexual pressure" training to supervising probation officers.  Costello, when asked if he received any training about social interaction between probation officers and people of the opposite sex, explained that in one training session, "[Costello] was the probation officer and [a female trainer] was playing the probationer and she pretended to be coming on to me as a woman to a guy, . . . . it was ongoing training to make us aware of the potentials of weaknesses, to be careful not to give in to temptations."  (Costello Dep. at 119-20.)

        In sum then, it can be reasonably inferred from the record that: (1) DOP policymakers are aware of the possibility that agency employees might have social relationships with probationers, and

---

        [12] Costello testified: "So if you were a probationer you'd be there and I would be here, so if something happened I would have access to be able to get out the door.  I wouldn't be trapped in the room where I couldn't get out the door where the probationer could block the entrance outside the door.  That's common knowledge when we interview a probationer, the door always has to be open and you shouldn't have anything dangerous on your desk, also, like hammers or anything that can be used as an instrument, at all times." (Costello Dep. at 122.)

that such relationships can create a conflict of interest, or the appearance of a conflict of interest; (2) that DOP policymakers believe that allowing probation officers' office doors to be closed during interviews puts officers at risk of physical harm; and (3) that DOP policymakers are aware that probation officers might be offered sexual favors by people under their supervision.

This awareness, however, does little to establish Plaintiff's "failure to train" claim.  Each of the policies or practices cited appears to address a concern that those under supervision may attempt to influence or harm their probation officers.  They are not evidence of an awareness that probation officers may attempt to coerce those under their supervision.  In any event, it is self-evident that probation officers, like others in positions of authority, will be presented with opportunities to take advantage of people under their supervision.  Likewise, the Court does not quibble with the proposition that such exploitation – especially if sexual and involving a minor – can result in constitutional harm. See U.S. v. Giordano, 442 F.3d 30, 47 (2d Cir. 2006) (holding that minors have a right under the Fourteenth Amendment to be free from sexual abuse by a state actor); Spencer v. Doe, 139 F.3d 107, 111-12 (2d Cir. 1998) (noting that juvenile detainee had a Fourteenth Amendment right to be protected from sexual molestation); Annis v. County of Westchester, N.Y., 36 F.3d 251, 254 (2d Cir. 1994)("[H]arassment that transcends coarse, hostile and boorish

behavior can rise to the level of a constitutional tort.").

Nonetheless, these assumptions show only "that a situation [may] arise and that taking the wrong course in that situation will result in injuries to citizens." Walker, 974 F.2d at 299.  Under Walker and Green, Plaintiff also must demonstrate that a failure to adequately train and supervise probation officers creates a likelihood that probation officers will engage in improper sexual behavior with defendants and probationers, see id. at 299, and that there exists a "specific deficiency" in the City's training program that was the proximate cause of Plaintiff's injury, see Green, 465 F.3d at 81.  Plaintiff simply fails to proffer any competent evidence to establish either element.

With respect to the question of whether the City's alleged failure to train probation officers against sexual involvement with defendants created a likelihood of constitutional harm, the analysis is somewhat hampered by the muddled nature of Plaintiff's Section 1983 claim.  On one hand, Plaintiff appears to be alleging that Waite made explicit quid pro quo sexual demands of him.  (See Pl.'s City Mem., at 1) (claiming that Waite "forced plaintiff into an unwanted sexual relationship with her under threat of possible criminal penalties against him for not submitting to her demands").  At the same time, Plaintiff's memorandum of law and deposition testimony also suggest that Waite's alleged misbehavior was far more subtle.  Plaintiff asserts the "inherent[ly] coercive" nature

of interactions between probation officers and youthful offenders (see Pl.'s City Mem., at 8), and describes his participation in sexual activity with Waite as essentially fearful acquiescence to a non-specific, if not unspoken, threat that resisting her advances would adversely affect his PSR (see, e.g., Richardson Dep. at 29, 60-61, 88-95). In short, Plaintiff appears to be claiming both quid pro quo sexual harassment, and harassment by "inherent coercion."

As an initial matter, Plaintiff has not demonstrated that probation officers are so confused about, or oblivious to, the impropriety of such overt or implicit coercion that a failure of training and supervision makes it more likely that they will engage in the improper behavior. The situation posited by Plaintiff should not present municipal employees with a difficult choice that training would make less difficult. See Green, 465 F.3d at 81. "Where the proper response . . . is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to train or supervise." Walker, 974 F.2d at 299; see also Doe II v. City of Hartford, No. 01 Civ. 1026 (AHN), 2005 WL 2009051, at *6 (D. Conn. Aug. 22, 2005) ("Moreover, under Walker, because it should be obvious to officers without training or supervision that it is inappropriate and, indeed, unlawful to sexually assault

prostitutes, the plaintiff may only survive summary judgment by producing some evidence that policymakers were aware of that type of misconduct, but failed to institute appropriate training or supervision.")  In other words, Plaintiff has not demonstrated that probation officers require some sort of training to educate them that they should not be coercing sexual activity with people under their supervision. Cf. Richards v. City of New York, 433 F. Supp. 2d 404, 429 (S.D.N.Y. 2006) (explaining that municipal employees face a "difficult choice" in choosing the correct choice of action in a given situation because the choice "(1) requires more than common sense to be handled or (2) presents the employee with 'powerful incentives to make the wrong choice'"). No reasonable fact-finder could accept the unsupported proposition that municipal employees who may have the opportunity to extort or induce sexual favors from a defendant, especially a minor, are likely to do so unless they have been trained that such behavior is unacceptable. It is "reasonable for city policymakers to assume their employees possess common sense . . . ." Walker, 974 F.2d at 300.

Plaintiff could overcome this "common sense" presumption with a showing of "some evidence that policy makers were aware of a pattern [of misconduct] . . . but failed to institute appropriate training or supervision . . . ." Walker, 974 F.2d at 300. Plaintiff, however, fails to make such a showing. Establishing the existence of a significant problem requires competent evidence in

the record; it is simply not enough to assert that a given situation could happen. See Green 465 F.3d at 82 (holding that "despite the likelihood of a significant problem, [plaintiff's case fails because] there is no admissible evidence in the record of any problem"). Plaintiff's anecdotal evidence of alleged improper sexual conduct by probation officers toward probationers and defendants mischaracterizes the record and, in any event, fails to show a pattern of misconduct.[13] Plaintiff claims that Waite and Costello "recounted their knowledge of 'rumors' of conduct by other probation officers similar to Waite's conduct with plaintiff . . . ." (See Pl.'s City Mem., at 7.) Costello actually testified that he was not sure he had heard rumors about such behavior, and Waite said that she had heard of two "accusations" during her twelve years of employment at the DOP and had no idea if either was true.[14]

_____

[13] Moreover, Plaintiff makes no attempt at all to demonstrate that there is any pattern of misconduct by DOP employees towards youthful offenders.

[14] See Waite Dep. at 157-58 ("Do I know, I don't know any of this to be factual. You said did I hear of any [accusations of sexual impropriety], yeah, I heard through the office grapevine. Do I know any of it to be factual, no.").

Costello testified that "to the best of [his] knowledge," prior to the situation with Waite, he had not supervised a probation officer who had been accused of having social contact with a defendant or probationer outside of the probation office. When asked if he had heard of other Supervising Parole Officers having to handle such cases, Costello said: "I might – I'm not sure. I might have heard rumors of it, but I'm not sure. I don't remember offhand any cases, particular cases." (Costello Dep. at 98.)

In any event, Plaintiff's contention that two individuals heard "rumors" of unspecified incidents of improper conduct by probation officers does not establish the existence of "a pattern" of problematic behavior that has been ignored by DOP officials. Compare Walker, 974 F.2d at 300 (explaining that plaintiff's claim might survive summary judgment if he discovered evidence of a "'practice' of condoning perjury (evidenced perhaps by a failure to discipline for perjury) or a pattern of police misconduct"); Wahhab v. City of New York, 386 F. Supp. 2d 277, 285 (S.D.N.Y. 2005) (noting plaintiffs raised a material question of fact regarding a custom of municipal acquiescence to unconstitutional conduct by, in part, presenting reports and statistical information suggesting a "widespread pattern of police misconduct").

Plaintiff also contends that DOP policy makers knew of Waite's "proclivities towards inappropriate relationships with persons under her supervision," and asserts the existence of an atmosphere of "overall permissiveness at the DOP for Waite's conduct, which tends to prove that the culture by lower level personnel at the DOP accepted and permitted Waite to act as she wished." (Pl.'s City Mem., at 2, 9.) These claims are based upon little more than supposition. The record is bereft of any evidence that prior to her alleged liaisons with Plaintiff, Waite ever became sexually involved with, or exerted any form of pressure on, a defendant. Indeed, prior to the 2003 incidents that are the subject of this

24

action, Waite had never been disciplined by the DOP for any reason.

Plaintiff relies heavily on the purported existence of two letters from two defendants, allegedly expressing an interest in dating Waite, that allegedly were sent to the DOP.  Assuming that the letters existed, simply because they were sent to Waite does not establish or even suggest that she had a "proclivity" or "tendency" to form improper personal relationships with defendants. Indeed, the only evidence of these alleged communications is deposition testimony from Waite who stated that: (1) she did not personally receive the letters; (2) that one letter was from an inmate who wrote that "he knows he's not supposed to communicate with me, but I was nice to him so he sent the letter;" (3) that Waite's supervisor intercepted that communication and subsequently wrote to the warden of the facility where the author was being held, telling him not to allow the inmate to communicate with Waite; and (4) that Waite did not see the second letter until her relationship with Plaintiff had ended and she had been suspended from employment. (See Waite Dep. at 131-34.)  None of these facts evidence that Waite was ever personally involved with a defendant, or that her supervisors had any reason to believe she had been involved with a defendant.[15]

_____

[15] Plaintiff, perhaps realizing the shortcomings of his "proclivity" argument, seeks to lay blame for his lack of evidence on the City, which he claims "has not . . . produced the two letters as have [sic] been ordered by the Court for production . . ." (Pl.'s City Mem., at 9.)  If the letters

Plaintiff also has failed to present evidence that there existed "overall permissiveness at the DOP for Waite's conduct." (Pl.'s City Mem., at 9.)  Plaintiff cites a single instance (one of Waite's alleged liaisons with Plaintiff) of the DOP's alleged awareness of Waite's failure to comply with DOP policies.  Waite allegedly told a co-worker that Plaintiff was her "cousin" (DOP policy prohibits friends and family members from visiting DOP offices), and then brought Plaintiff into her office and locked the door behind them (as previously discussed, probation officers are directed not to close their doors during interviews). (See id.) The strongest claim these facts can support is that, on one occasion, a fellow DOP employee did not report Waite for violating either the DOP policy against bringing a family member to work, or the policy against closed doors during defendant or probationer interviews.[16]

_____

existed, Plaintiff does not have them because he did not make a timely request for them during discovery. (See June 20, 2006 Order.)  The Court did, however, order that "if there was any investigation undertaken with regard to the letters, or disciplinary action," that such documents be produced.  See id. Defendant City's counsel has represented that if any such letters were received they are no longer in DOP's files and there was no investigation of such letters or discipline of Waite. (See Letter of Hillary A. Frommer to Michael P. Mangan, dated Aug. 1, 2006.)

[16] Determining which DOP policy Waite's co-worker allegedly turned a blind eye to depends, of course, on the co-worker's subjective belief as to Plaintiff's identity.  If the co-worker believed Plaintiff was a relative, then she ignored Waite's apparent violation of the family visitation policy, but not a violation of the closed door policy which applies only to situations where a defendant or probationer is in the office. Conversely, if the co-worker believed Plaintiff was a defendant, then there was no violation of the family visitation policy, and

No reasonable factfinder could infer from this one-time occurrence that there existed an atmosphere at the DOP of "overall permissiveness" with respect to Waite engaging in sexual activity with defendants.

Plaintiff attempts to bolster his "overall permissiveness" argument by speculating that one of Waite's fellow probation officers knew that Waite was engaging in sexual activity with a minor who was also a defendant under Waite's supervision. (See Pl.'s City Mem., at 10.)  Plaintiff has submitted no evidence indicating that the co-worker did in fact know Plaintiff's identity; but, even if the co-worker did, this hardly rises to the level of overall agency "permissiveness."  There is no evidence that any of Waite's supervisors were aware of Waite's social or sexual relationship with Plaintiff.

In sum, Plaintiff has offered nothing more than "wholly conclusory" allegations to establish that DOP officials knew of a problem with sexual misconduct by probation officers, or Waite specifically, and chose to ignore it.  See Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) (citing Butler v. Castro, 896 F.2d 698, 700 (2d Cir. 1990)) ("A conclusory allegation . . . without evidentiary support or allegations of particularized incidents, does not state a valid claim."); see also Kerzer v. Kingley Mfg., 156 F.3d 396, 400 (2d Cir. 1998) (noting that genuine

the co-worker overlooked a violation of the closed door policy.

issues of fact are not created by "conclusory allegations, conjecture, and speculation").

Finally, the Court notes that Plaintiff also has failed to "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" Green, 465 F.3d at 81. It is not sufficient simply to demonstrate that Waite was not well-trained, as the fact that "a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the [employee]'s shortcomings may have resulted from factors other than a faulty training program." City of Canton, 489 U.S. at 390-91, 109 S. Ct. 1206.[17]

---

[17] Plaintiff asserts that "[u]nder the Rule 8 liberal pleading requirements of § 1983 claims, 'a plaintiff is not required to state or establish exactly the policy by which he alleges defendants violated his rights, nor is he required to plead more than a single instance of misconduct.'"  (Pl.'s City Mem., at 5.) (quoting Wahhab, 386 F. Supp. 2d at 285). Plaintiff is correct that the Supreme Court's decision in Leatherman v. Tarrant Co. Narcotics Intel. and Coord. Unit, 508 U.S. 163, 113 S. Ct. 1160 (1993), prohibits the summary dismissal of complaints alleging municipal liability that "contain[] only conclusory, vague, or general allegations" for failure to state a claim. However, a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is not presently before the Court.  Discovery is complete, and defendants have moved for summary judgment.  Plaintiff is thus required to show more at this stage of the litigation than a conclusory claim. See Amnesty Am., 361 F.3d at 130 n.10 ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation. After discovery, on the other hand, a

Plaintiff makes much of the fact that the DOP has a policy prohibiting "social contact" between probation officers and probationers, but not one prohibiting such contact between probation officers and defendants. (See Pl.'s City Mem., at 9.) Plaintiff appears to argue that this disparity is evidence of the City's failure to adequately train probation officers to refrain from improper relationships with defendants. (See id.) Plaintiff also asserts that the DOP has "no policies or special considerations for the protection of youthful offenders." (Id. at 8.) Plaintiff suggests that the DOP should have policies (1) requiring that the parent or guardian of youthful offenders be called during a pre-sentence investigation; (2) that probation officers keep a log of all contacts with all defendants (especially youthful offenders); and (3) that probation officers should be prohibited from using cell phones to call youthful offenders. (See id. at 8-9.)

The Court finds these arguments unpersuasive for several

---

plaintiff is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation."); Singleton, 1 F. Supp. 2d at 312 ("plaintiff cannot withstand a motion for summary judgment by mere reliance on conclusory allegations . . . . [s]he must set forth specific facts showing there is a genuine issue for trial"); Simpkins v. Bellevue Hosp., 832 F. Supp. 69, 75 (S.D.N.Y. 1993) (holding that a claim should not be dismissed only on the basis of the complaint, but that its merits could be more adequately addressed on a motion for summary judgment).

reasons.   First, whether or not the DOP has an articulated policy or regulation regarding "social contact" with defendants, as opposed to probationers, does not establish that the City has failed to train probation officers with respect to engaging in sexual activity with defendants.   It is highly dubious that a reasonable factfinder would accept that the City was <u>sanctioning</u> social relationships between probation officers and defendants merely because the policy against social relationships referred to probationers and did not separately address defendants.   Moreover, Plaintiff frequently characterizes his claim as an improper "social relationship," when he is really claiming injury from a <u>coerced sexual relationship</u>.   In other words, Plaintiff was not harmed because Waite socialized with him, but because she allegedly coerced him, either overtly or implicitly, into sexual acts.   His burden then is to show that (1) there was a need for training because of a problem with coercive behavior, sexual or otherwise, by probation officers, or because the City was aware of a general or specific problem with Waite engaging in improper sexual behavior with people under her supervision, and (2) that the absence of such training was the proximate cause of his injuries.

Yet, once again, Plaintiff failed to produce any evidence that there are actionable shortcomings in the City's sexual misconduct

30

training.[18]  "[Plaintiff] has simply assumed on the basis of the events at issue both that the training of [the municipal employees] was inadequate and that this inadequate training was the 'moving force' of the [municipal employee]s' allegedly unconstitutional behavior.  Each assumption is question-begging. Under plaintiff's argument, inadequate training would always be inferred merely from the fact that a constitutional deprivation by a [municipal employee] occurred."  Carnegie v. Miller, 811 F. Supp. 907, 913 (S.D.N.Y. 1993) (internal citations omitted).  Plaintiff has thus failed to raise a triable issue of fact with respect to inadequate training of probation officers, and how any deficiencies in the training caused his injury.  See Phillips, 2006 WL 2739321, at *28-29.

     In any event, the Court notes that the DOP does have

_____

     [18] Plaintiff again suggests that the evidence is not in the record because the City has improperly refused to turn it over. (See Pl.'s City Mem., at 8.) ("Plaintiff demanded all materials for training to prevent against sexual or other coercion and for sensitivity training for the civil rights of others and the City produced nothing in response.")  In fact, Plaintiff does not have these materials because he requested the information in a series of interrogatories that this Court determined were overbroad, or did not otherwise comply with Local Civil Rule 33. (See July 20, 2006 Order.) Plaintiff did not timely remedy his request and thus failed to avail himself of the opportunity to conduct discovery on the issue of whether the City has appropriate training in place to prevent against sexual misconduct by probation officers. Nonetheless, in response to Plaintiff's motion for reconsideration of the July 20, 2006 Order, the Court did compel the City to produce "any EPAP's regarding supervision of probationers under the age of 18 and social interaction with individuals under supervision."  (See July 26, 2006 Order.) Responsive documents were produced, if they existed.

regulations in its Code against sexual harassment and intimidating and threatening behavior.  (See DOP Policies, supra at 9-11.) "Without evidence that these provisions were ignored prior to the incident at issue in this lawsuit, a reasonable jury could not find that the City had a further training obligation." Green, 465 F.3d at 82.

Similarly, there is no triable issue of fact with respect to Plaintiff's claim that the City should be liable under Section 1983 because it does not have special policies in place to prevent against the sexual exploitation of youthful offenders by probation officers.  Plaintiff has made no showing that probation officers have used their positions to extort or induce sexual favors from youthful offenders, or that the DOP has ignored a pattern of such misconduct.[19]

For all of these reasons, the City's motion for summary judgment with respect to Plaintiff's Section 1983 claim is granted.

_____

[19] Plaintiff has submitted an affidavit from Dr. Robert Lloyd Goldstein, a New York psychiatrist, in support of his contention that "[p]ersons under the age of 19 years old are considered by the laws of New York to be of a 'unique status' due to their lack of experience, their lack of development, and their greater need for protection." (See Pl.'s City Mem., at 8).   Dr. Goldstein states that "sexual misconduct is widespread and well-known to occur in a variety of contexts where there is a power imbalance." (See Affirmation of Robert Lloyd Goldstein, M.D., dated July 28, 2006, attached as Ex. A to Pl.'s City Mem., at 3.) This sweeping generalization has no probative value with respect to proving that the City was aware of a problem in the supervision of youthful offenders, or that the absence of training on this issue was the cause of Plaintiff's injuries.

B.   <u>State Law Claims Against the City</u>

  1.   <u>Vicarious Liability</u>

While a municipality cannot be held vicariously liable under Section 1983 for the acts of its employees, <u>see</u> <u>Green</u>, 465 F.3d at 80 (citing <u>Coon</u>, 404 F.3d at 686-87), it can be liable under New York State common law for torts committed by its employees while acting within the scope their employment, <u>see</u> <u>Adorno v. Corr. Servs. Corp.</u>, 312 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (citing <u>Riviello v. Waldron</u>, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302 (1979).   The New York Court of Appeals has articulated five factors for determining whether a tort has been committed within the scope of employment:

> (1) the connection between the time, place and occasion for the act; (2) the history of the relationship between employer and employee as spelled out in actual practice; (3) whether the act is one commonly done by such an employee; (4) the extent of departure from normal methods of performance; [and] (5) whether the specific act was one that the employer could reasonably have anticipated.

<u>Haybeck v. Prodigy Servs. Co.</u>, 944 F. Supp. 326, 329 (S.D.N.Y. 1996) (citing <u>Riviello</u>, 47 N.Y.2d at 302, 418 N.Y.S.2d at 302).

Applying these factors to the instant case, the Court concludes that Plaintiff has made a sufficient showing only on the first factor.   Plaintiff's testimony that he was assaulted in Waite's office at the DOP, while present ostensibly to deliver documents she requested, demonstrates a connection between the time, place, and occasion for the challenged conduct and Waite's

employment with the City.  However, as discussed in the context of the Section 1983 claim, Plaintiff has failed to provide any evidence to support any of the other factors.  There is no history of sexual misconduct by Waite that her employer should have known about, nor is there evidence that there was a problem at the DOP with probation officers coercing sexual favors or otherwise taking advantage of minors.

Moreover, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."  Adorno, 312 F. Supp at 517 (quoting Ross v. Mitsui Fudosan, Inc., 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998)).  New York courts "have repeatedly found no vicarious liability for claims involving sexual misconduct . . . ."  Adorno, 312 F. Supp. 2d at 517; see also Steinborn v. Himmel, 9 A.D.3d 531, 532, 780 N.Y.S.2d 412, 414 (3d Dep't 2004) (holding that "even if any of the defendants could fairly be characterized as employers or principals of [defendant] (an issue we do not reach), [defendant]'s sexual assaults were clearly outside the scope of his duties as an assistant scoutmaster"); Dia CC v. Ithaca City School District et al., 304 A.D.2d 955, 956, 758 N.Y.S.2d 197, 199 (3d Dep't 2003) (holding that "[a]n act of sexual assault by an employee is a clear departure from the scope of employment, committed solely for personal reasons, and unrelated to the

furtherance of the employer's business").   Accordingly, no reasonable jury could conclude that Waite was acting within the scope of her employment when she allegedly coerced sexual acts from Plaintiff.   It follows that the City cannot be held vicariously liable for Waite's sexual misconduct.[20]

2.   Negligence

Under New York law, "[a] cause of action for negligent hiring or retention requires allegations that the employer 'knew or should have known of the employee's propensity to commit injury,' or the employer failed to investigate a prospective employee notwithstanding knowledge of 'facts that would lead a reasonably prudent person to investigate that prospective employee,'" Adorno, 312 F. Supp. 2d at 518 (quoting Sheila C. v. Povich, 2 Misc.3d 315, 324, 768 N.Y.S.2d 571, 580 (2003)); see also Wilson v. Diocese of New York, No. 96 Civ. 2400 (JGK), 1998 WL 82921, at *3-4 (S.D.N.Y. Feb. 26, 1998).

Again, as discussed, Plaintiff has presented no evidence that the City knew or should have known of any proclivity on Waite's

---

[20] Plaintiff argues that the City implicitly conceded that Waite was acting within the scope of her employment by taking a position at her DOP administrative hearing that she misused her "official capacity" for personal gain.  Plaintiff argues that this "serves to require the City to maintain that (sic) position that Waite was acting within her official duties, and thus when (sic) within her scope of employment." (Pl.'s City Mem., at 2.) As discussed infra, Plaintiff improperly conflates the issue of whether Waite was using her authority as a DOP officer for personal gain with the issue of whether her actions were within the scope of her employment.

part for engaging in sexual acts with the people she supervised, either prior to hiring her or during her employment. Plaintiff worked, apparently without incident, for more than twelve years before the allegations in this case arose. Thus, no reasonable juror could conclude that the City was negligent in hiring and in retaining Waite as a probation officer.

## II.   Plaintiff's Claims Against Waite

The gravamen of Plaintiff's claims against Waite is that she knowingly ignored Plaintiff's resistance to her sexual advances, and used her authority to obtain sexual favors from Plaintiff. (See Plaintiff's Memorandum of Law in Opposition to Defendant Nicole Waite's Motion for Summary Judgment, dated July 26, 2006, at 1.) Waite argues that there is no evidence that Plaintiff was coerced into engaging in sexual activity, and that, in any event, she is entitled to qualified immunity. (See Memorandum of Law in Support of Defendant Nicole Waite's Motion for Summary Judgment, dated June 19, 2006 ("Waite Mem."), at 7, 11.)

### A.   42 U.S.C. § 1983

Because Plaintiff cannot sustain a Section 1983 claim against the City, there is no viable Section 1983 claim against Waite in her official capacity. See Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985) (holding that "an official capacity suit is, in all respects other than name, to be treated as a suit against the [municipal] entity . . . ."); Goldberg v. Town of Rocky

<u>Hill</u>, 973 F.2d 70, 73 (2d Cir. 1992).  A Section 1983 claim against Waite in her personal capacity, however, survives Waite's summary judgment motion because there is sufficient evidence for Plaintiff to establish that Waite acted under color of state law to deprive him of his constitutional rights.  Plaintiff alleges that Waite misused her position and authority as a probation officer to force him on three occasions to commit or participate in sexual acts against his will.  As discussed, Plaintiff has a constitutional right not to be compelled to commit sexual acts by a government actor.  <u>See</u> <u>Giordano</u>, 442 F.3d at 47; <u>Spencer</u>, 139 F.3d at 112; <u>Annis</u>, 36 F.3d at 254.  The critical issues then are whether a reasonable finder of fact could determine that Waite was acting under "color of state law" when she allegedly engaged in sexual activity with Plaintiff, and whether she coerced Plaintiff into engaging in sexual activity.

There is a dispute between the parties as to the frequency of Plaintiff and Waite's sexual contact, and whether it was consensual.  These are issues of fact that cannot be resolved on summary judgment.  Turning to the question of whether Waite was acting under color of state law, "[t]he Supreme Court has recognized that an individual is acting under color of state law when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  <u>Hayut v. State University of New York</u>, 352 F.3d

733, 744 (2d Cir. 2003) (quoting <u>Polk County v. Dodson</u>, 454 U.S. 312, 317-18, 102 S. Ct. 445, 449 (1981)); <u>see also</u> <u>West v. Atkins</u>, 487 U.S. 42, 50, 108 S. Ct. 2250, 2255 (1988) (noting that in the Section 1983 context, a defendant "acts under color of state law when he abuses the position given to him by the State"). "Although no 'bright line' separates actions taken under color of law from personal pursuits, the relevant question in determining whether an action was taken under color of law is not whether the [action] was part of the defendant's official duties but, rather, whether the [action] was made possible only because the wrongdoer is clothed with the authority of [federal] law," <u>United States v. Temple</u>, 447 F.3d 130, 138 (2d Cir. 2006) (internal quotation and citations omitted).

A reasonable juror could conclude that Waite was acting under color of state law when she engaged in sexual activity with Plaintiff.  Not only did one of the alleged incidents occur in Waite's office at the DOP, but during the entire course of the alleged sexual activity, Waite was responsible for completing Plaintiff's PSR, which was to contain a recommendation as to whether he would be granted Youthful Offender status.  A reasonable juror could therefore conclude that Waite exercised power over Plaintiff because of the authority which was bestowed upon her by virtue of state law.  Accordingly, Defendant Waite's motion for summary judgment on Plaintiff's Section 1983 claim is denied.

B.   <u>Waite's Claim of Qualified Immunity</u>

Waite claims that she is entitled to qualified immunity. "Qualified immunity protects government officials from civil liability when performing discretionary duties 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 148 (2d Cir. 2006) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).   "What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." <u>Wilson v. Layne</u>, 526 U.S. 603, 614, 119 S. Ct. 1692, 1699 (1999) (internal quotation marks omitted).

The first question in assessing a claim of qualified immunity is whether the plaintiff's version of the facts "show[s] the officer's conduct violated a constitutional right." <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  If so, "the next, sequential step is to ask whether the right was clearly established." <u>Id.</u>.  The essential question is whether, "viewing the evidence in the light most favorable to plaintiff[], no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." <u>Demoret</u>, 451 F.3d at 148 (citing

39

Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001)).

As discussed, Plaintiff had a clearly established constitutional right not to be coerced into committing sexual acts by a public official.  The issue of whether Waite was acting reasonably necessarily rests on a factual determination of what occurred between her and Plaintiff, and whether Plaintiff's participation in the alleged sexual acts was voluntary or coerced. That determination rests with the jury.  Accordingly, Waite is not entitled to summary judgment on the basis of qualified immunity.

C.   State Law Claims Against Waite

"Under New York law, '[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)). "It does not matter that the penal law lays down specific elements for the various offenses or degrees of offenses that entail unwanted touching. . . . In the civil context. . ., the common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching." Id. As to claims for intentional infliction of emotional distress under New York law, four showings are required: (1) extreme and outrageous conduct, (2) intent to cause, or disregard of a substantial probability of causing, severe

emotional distress, (3) a causal connection between the outrageous conduct and injury, and (4) severe emotional distress. Ross, 2 F. Supp. 2d at 533 (citing Howell v. New York Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993)).

That Plaintiff and Waite engaged in sexual activity is not in dispute.  Rather, the parties' dispute centers on the frequency of the sexual contact and whether it was consensual.  Waite argues that Plaintiff's claims fail because "the only evidence offered by plaintiff in support of his claims is his account of his alleged subjective belief that Waite would somehow penalize him if he did not have sex with her."  (See Waite Mem., at 7.)  Waite contends that Plaintiff's subjective beliefs are not sufficient to establish coercion, and that he must demonstrate that Waite at least "took some overt action to misuse her position as probation officer (sic) to coerce plaintiff into engaging in sex with her." (See id.) Waite proffers no legal support for this contention.

How often the parties engaged in sexual activity and whether it was consensual are matters of fact that cannot be resolved on a motion for summary judgment.  A reasonable juror could conclude that improper sexual advances combined with the power imbalance between Waite and Plaintiff was sufficient to give rise to coercion.  See Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989) ("As [Plaintiff's] immediate superior and chief evaluator, he held a position of power over her that, in

41

combination with his unwelcome sexual advances, was tantamount to coercion."). Plaintiff contends that he interpreted Waite's words and actions as threats, thus causing him to engage in sexual activity against his will; as a result, Plaintiff claims to have suffered emotional harm. "Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." McClellan, 439 F.3d at 148 (quoting United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994)). Waite's motion for summary judgment, therefore, is denied with respect to Plaintiff's state law claims.

## CONCLUSION

For the reasons stated above, this Court grants the City's motion for summary judgment and dismisses with prejudice Plaintiff's constitutional and common law claims against the City. The Court denies Defendant Waite's motion for summary judgment, except with respect to Plaintiff's Section 1983 claim against Waite in her official capacity.

SO ORDERED.

Theodore H. Katz
United States Magistrate Judge

Dated:      December 21, 2006
            New York, New York